UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

DONNIE BRAINARD and VIKTORIA SZOLNOKI-BRAINARD,
      Parents,
      individually and on behalf of N.B., Student,

      Plaintiffs,                       No. _____

v.

BOARD OF EDUCATION OF ALBUQUERQUE
PUBLIC SCHOOLS,

      Defendant.

CIVIL ACTION UNDER IDEA and
COMPLAINT for declaratory and injunctive relief to
enforce IDEA and federal laws prohibiting
disability discrimination in delivery of public education

I. PRELIMINARY STATEMENT

1.      This case follows a 2019 administrative IDEA due process hearing in Albuquerque, New Mexico for eight year old N.B., a child with autism who has been labeled a "threat" by his public school district based on school district threat assessment policies and procedures which violated his rights under IDEA and which are based on illegal stereotypes and false assumptions about persons with disabilities, including school aged children with autism.

2.      The IDEA Due Process Hearing Officer found that Albuquerque Public Schools (APS) violated the IDEA and denied Student a free appropriate public education (FAPE) when the School District in March 2019 (a) conducted a "threat assessment team" meeting about N.B. without participation of his parents and when it (b) failed to provide Parents with the paperwork documenting the School District's threat assessment deliberations, conclusions and plan. As equitable remedy, the Due Process Hearing Officer ruled that N.B.'s parents should be invited to

any future Threat Assessment Team meetings concerning N.G. but limited that ruling by ambiguities which jeopardize enforceability of the remedy for N.B. as well as its applicability to other students with disabilities and their parents entitled to protections of IDEA in the same school district.

3.      This action seeks revision to equitable remedy awarded by the IDEA Due Process Hearing Officer for N.B. and his parents,  as well as declaratory and injunctive relief, including changes to APS's Threat Assessment Team policies and practices for the benefit of N.B. and a class of similarly situated public school students with disabilities and their parents.

## II. OVERVIEW OF ALL CLAIMS

4.       This is a civil action under IDEA which  seeks revision to equitable remedy awarded for N.B. and his parents in administrative due process hearing under the IDEA and also seeks award of attorney fees for Parents as prevailing parties in that IDEA administrative hearing.

5.      This action also seeks declaratory and injunctive relief under IDEA, Section 504 and Title II of the Americans with Disabilities Act for N.B. and his Parents as well as other similarly situated APS students with disabilities and their parents.    Plaintiffs will ask the Court to  require and direct permanent changes in the School District's use of Threat Assessment Teams meetings on students with disabilities and subsequent maintenance and distribution of Threat Assessment Team paperwork, which policies, practices and paperwork currently violate IDEA and federal law prohibiting discrimination on the basis of disability by public schools.

## III.  JURISDICTION and EXHAUSTION OF ADMINISTRATIVE REMEDIES

6.      This Court has jurisdiction pursuant to the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §1415(i)(3)(A),(B); Section 504 of the Rehabilitation Act (Section 504),

29 U.S.C. §794 *et seq.,* and Title II of the Americans with Disabilities Act, (ADA), 42 U.S.C.

§12131 *et seq.*                         .

7.      Plaintiffs have exhausted administrative remedies available for N.B. under the

IDEA, pursuant to 20 U.S.C. §1415(l).

8.      As for members of a prospective class, exhaustion is accomplished through the

underlying administrative IDEA due process case for N.B., or is unnecessary or futile since this

action seeks to remedy and  halt a school district policy of universal applicability to students with

disabilities for whom APS conducts Threat Assessment Team meetings.

### IV.  PARTIES, VENUE

9.      Donnie Brainard and Viktoria Szolnoki-Brainard are the parents of N.B., a minor

child.

10.     At all material times, N.B. was a school-aged New Mexico resident living within

the boundaries of the Albuquerque Public Schools District who had a disability, qualified for

receipt of special education pursuant to the IDEA under the eligibility of Autism, and had an IEP

(Individualized Education Plan).

11.     For purpose of Autism eligibility under IDEA:

> Autism means a *developmental disability significantly affecting*
> *verbal and nonverbal communication and social interaction,*
> generally evident before age three, that adversely affects a child's
> educational performance.  Other characteristics often associated
> with autism are engagement in repetitive activities and stereotyped
> movement, resistance to environmental change or change in daily
> routines, and unusual responses to sensory experiences.

34 C.F.R. §300.8( c)(1)(i).(emphasis added).

12.     New Mexico special education regulation requires that IEP teams meeting for

students with Autism eligibility undertake 11 considerations regarding specific strategies which may be required for the student who has Autism. §6.31.2.11(B)(5)(a)-(k) NMAC.    Six out of the 11 considerations required by New Mexico regulation to be made for students with autism reference possible "behavior" needs or skill deficits relating to behavior.

13.    N.B.'s autism creates impairment which limits one or more major life activities, including learning, communicating, social communication, and behavior.

14.    N.B. is a qualified handicapped person within the meaning of Section 504 of the Rehabilitation Act in that he has a disability which limits major life activities and he is a school aged person entitled to receipt of public education.

15.    N.B. is a qualified individual with a disability  within the meaning of the ADA in that he has a physical or  mental impairment which limits one or more major life activities including learning, communication, social communication and behavior, and/or he is an individual with a record of such impairment, and he is a school aged person entitled to receipt of public education.

16.    Defendant Board of Education of Albuquerque Public Schools is established by the New Mexico Constitution and state law as the entity which supervises and controls Albuquerque Public Schools.  Pursuant to state law, the Board of Education is the legal entity to be sued for claims against Albuquerque Public Schools.

17.    Albuquerque Public Schools ("APS",  "the School District, " or "LEA") is N.B.'s Local Educational Agency ("LEA") within the meaning of the Individuals with Disabilities Education Act (IDEA).

18.    The School District receives federal funding and must comply with Section 504 of

the Rehabilitation Act ("Section 504") which prohibits discrimination on the basis of disability.

19.    The School District is a public entity within the meaning of Title II of the Americans with Disabilities Act ("ADA") and is prohibited from discriminating on the basis of disability in delivery and services of public education.

## V. TIMELINESS OF COMPLAINT

20.    On August 9, 2019 , Parents filed a Request for IDEA administrative Due Process Hearing against APS because N.B. was being denied free appropriate public education (FAPE) by the School District.  (hereinafter referenced as DPH 1920-04).

21.    Following appointment of a Due Process Hearing Officer ("DPHO")  by New Mexico Public Education Department ("NMPED"), a due process hearing was conducted in Albuquerque, New Mexico over ten days in October, November, and December 2019.

22.    The Due Process Hearing Officer (DPHO) issued a final written decision in DPH 1920-04 on April 1, 2020 which decision was also received on April 1, 2020.

23.    The DPHO administrative decision held that APS had denied N.B. a free appropriate public education (FAPE) in several ways and ordered remedy be provided by APS.

24.    Although the DPHO administrative decision did not rule in Parents' favor on all issues, Parents substantially prevailed and are prevailing parties within the meaning of IDEA.

25.    Pursuant to state special education regulation implementing IDEA, a civil action appealing any part of an IDEA administrative due process hearing decision or seeking attorney fees must be filed within 30 days of receipt of the due process decision. §6.31.2.13(I)(24)(a) NMAC and §6.31.2.13(I)(25)(a)(i)NMAC.

26.    This civil action is timely as to Parents' IDEA claims seeking revision of the

equitable remedy ordered under IDEA and seeking award of attorney fees and costs as prevailing parties,  being filed within 30 days of receipt of the Due Process Hearing Officer's final decision.

27.     As to Parents' Section 504 and ADA claims for N.B. and a proposed class of students and parents impacted by APS's conduct of Threat Assessment Team meetings during the 2016-17 (part of the year) , 2017-18, 2018-19 and 2019-20 school years, this action is timely being filed within the three year statute of limitations for disability discrimination in New Mexico.

## VI. FACTS

28.     At all material times, APS has had a Threat Assessment Program described in written policies or guidelines.

29.     At time of filing this Complaint, the Albuquerque Public Schools website  states that "[t]he primary purpose of the Threat Assessment Program is to prevent targeted school violence."  The program is identified as part of the APS "Student and Staff Supports Department."  *See,*

https://www.aps.edu/student-family-and-community-supports/threat-assessment (last viewed on 5-1-20).

30.     According to APS's Student and Staff Supports Department, "[T]he threat assessment process involves identifying, assessing and managing students who might pose a risk of violence to an identified or identifiable target. (Another student, staff member or facility)." *See,* Id.

31.     Upon information and belief, APS's current description of its Threat Assessment Program, as provided above, has been substantially the same during the school years at issue:

2016-17; 2017-18; 2018-19; 2019-20 (hereinafter, "the school years").

32.     During all the school years, APS has applied different processes and procedures for students with disabilities than for nondisabled students.   APS's written policies and forms as well as its established practices regarding Threat Assessments discriminate against N.B. and all other APS students with disabilities on the basis of disability.

33.     For the 2016-17 school year, APS reported that 702 students were referred for informal review or a Formal Threat Assessment.  Of that total, 390 were students with disabilities.[1]

34.     During the 2016-17 school year, 54% of the students referred for informal review or Formal Threat Assessment were students with disabilities eligible for special education under the IDEA.   During the same school year, students with disabilities represented approximately 17%  of the students in APS.

35.     During the 2016-17 school year, students with disabilities were disproportionately subject to Threat Assessment Team procedures — they were 3 times more likely to be identified as needing "threat" assessments by APS than were their nondisabled peers.

36.     For the 2017-18 school year, APS reported that 909 students were referred for an informal review or a Formal Threat Assessment.  Of that total, 488 were students with disabilities.[2]

---

[1] The number of students with disabilities was calculated by subtracting the number of "gifted" students included in APS reporting on threat assessments against  "special education students."  "Gifted" is a state law " special education"  eligibility, but it is not a disability and is not covered by the IDEA.

[2] Id.

37.     During the 2017-18 school year, 53% of the students referred for informal review or Formal Threat Assessment were students with disabilities eligible for special education under the IDEA.   During the same school year, students with disabilities represented approximately 17% of the students in APS.

38.     During the 2017-18  school year, students with disabilities were disproportionately subject to Threat Assessment Team procedures — they were 3 times more likely to be identified as needing "threat" assessments by APS than were their nondisabled peers.

39.     For the 2018-19 school year, APS reported that 834 students were referred for an informal review or a Formal Threat Assessment.  Of that total, 440 were students with disabilities. [3]

40.     During the 2018-19 school year, 52% of the students referred for informal review or Formal Threat Assessment were students with disabilities.  During the same school year, students with disabilities represented approximately 17%  of the students in APS.

41.     During the 2018-19  school year, students with disabilities were disproportionately subject to Threat Assessment Team procedures — they were 3 times more likely to be identified as needing "threat" assessments by APS than were their nondisabled peers.

42.     The current 2019-20 school year has not yet ended although students quit attending school campuses after March 27, 2020 based on state public health orders related to COVID 19.

43.     APS has not yet released its report for Threat Assessments during the 2019-20 school year which, due to lack of a full school attendance year for APS students, may make it difficult to compare this school year to the three previous school year for which cumulative data

_____

[3] Id.

for a full school year is published.

44.     APS announced, as part of its 2017-18 school year reporting that the Director of Threat Assessments had "formed a committee comprised of School Psychologists and Special Education Administrators to examine and evaluate all aspects of the program to make recommendations for improvement."     In this May 30, 2018 document, the APS Director of Threat Assessments also announced that "[a] report of the committee's recommendations will be made public as soon as possible."

45.     Upon information and belief, the described committee never made recommendations or recommendations were never made public.

46.     Upon information and belief, APS has consistently, and during all school years at issue, had a *different* threat assessment process for students with disabilities and for non-disabled students.

47.     As stated in the APS document "Threat Assessment at-a-glance" (Jan 2012), "general education students" are referred to a local behavioral health provider which contracts with APS to conduct threat assessments.  It is only "special education students" who are subjected to the APS internal "Threat Assessment Team" meeting/process described in this Complaint.

48.     As recently as August 2017, APS awarded a one year contract to Southwest Family  Guidance Center and Institute to conduct Threat Assessments on APS students (who are not in special education ).  APS approved an RFP for the contract paying Southwest Family Guidance Center at the rate of $100 per hour to conduct Threat Assessments on referred students, who consist, upon information and belief, of nondisabled students not receiving special

education.

49.    Upon information and belief, APS continues to contract with one or more behavioral health provider(s)  to conduct private assessments of general education students referred for informal review or formal Threat Assessment.   The mechanics and resulting documentation of the private assessment for nondisabled students is currently unknown.

50.     N.B., who was in second grade, was subject to two  informal threat assessments and one formal threat assessment during the 2018-19 school year.   An informal threat assessment consists of a one-page description of an incident and is done "to document."  A formal threat assessment is done by a Threat Assessment Team (TAT) meeting in secrecy and completing lengthy documentation on its belief and opinions about the students which documentation is maintained indefinitely and intended to be shared with future schools the Student may attend.

51.     According to testimony by the APS Director of Threat Assessments, the existence of two informal threat assessments on N.B. was a factor in determination that a formal threat assessment was required because of  an incident at school on March 7, 2019.

52.     Formal Threat Assessment paperwork has no specific descriptions of what occurred on March 7, 2019,  but "attached" paperwork describes the March 7, 2019 incident in this way:

> [N.B.] was throwing desks and screaming, [another student] was laughing and [N.B.] told [another student], "you're [sic] life is gonna be over" and punched [another student] twice before staff could intervene.

53.     The formal Threat Assessment Team (TAT)  for N.B. was not assembled for a meeting until  March 28, 2019.  The Threat Assessment Team (TAT)  was composed of four APS staff persons: (1) the elementary school assistant principal; (2) an APS school psychologist;

(3) the elementary school social worker; and (4) Student's special education classroom teacher. Upon information and belief, the APS school psychologist who participated did not know the Student or Parents; she ran the meeting and completed the paperwork.

54.    In accordance with APS official policy, Parents were not invited to participate the Threat Assessment Team meeting concerning their 7 year old child.   The meeting was conducted in secret.

55.    In accordance with APS official policy, Parents were not provided any of the documentation,  created during the meeting,  which consists of approximately 10 pages including four "Threat Assessment Team Confidentiality Agreement" forms signed by the APS staff participants.

56.    Contrary to APS official policy,  no preliminary interviews of parents or those familiar with the facts were conducted an no paperwork describing information garnered from interviews was considered by the TAT.

57.    The Threat Assessment Plan for N.B. records determination by the TAT that he was a "medium level threat."  According to the APS form, a Medium Level Threat is characterized by:

> There may be evidence of internal emotional distress and/or **intentional** infliction of distress on others.  A typical pattern includes veiled threats and intimidating statement, expressing attention-seeking anger, getting in people's faces, and has people "walking on eggshells."  This person tends to self-justify and blame others for their behaviors.
> [emphasis in original]

58.    The Threat Assessment Plan paperwork filled out by APS staff meeting as the TAT for N.B. fails anywhere to reference that he has Autism.

11

59.    In a deviation from APS official policy, Parents were not even provided the one page "Threat Assessment Plan Summary" form,  a form  intended to be signed by and given to parents in a separate meeting.

60.    APS's official policy  for Threat Assessments concerning students with disabilities receiving special education are described by a 40+ page document: **APS Resource Manual:  "Threat Assessment Plan"** (Jan.  2012 with revisions of Sept. 2016 and March 2017).  Upon information and belief, this Resource Manual was in effect during the March 2019 meeting for N.B. and continues in effect through the present.

61.    APS's official policy concerning threat assessments for students with disabilities receiving special education, as described in the **APS Resource Manual,** includes the following directives and guidelines:

(A)    initially,  determination should be made whether the threat is "plausible" or "implausible";[4]

(B)    parents are not members of the Threat Assessment Team "because the presence of family members and their myriad of emotions might cloud the necessary objectivity of the process. . . . [and their presence might make] staff . . . reluctant to talk candidly about the student, his/her behavior, and his/her family situation";

( C)    determination of the "Level of Threat" requires exercise of "professional judgment";

(D)    a Threat Assessment Team (TAT or "the Team")  must include a "District SPED

---

[4] APS conducted  formal Threat Assessment for N.B. because the seven year old child told another student in his classroom, who was laughing, "you're [sic]  life is gonna be over" and twice "punched" another student.

[special education department] administrator";

(E)      persons with knowledge of the events must be interviewed before the Threat

Assessment Team meeting;

(F)      "[t]he Team needs to be able to support and defend the facts and opinions that are

recorded on the Threat Assessment Plan Protocol";

(G)      the student being assessed as a threat "may be viewed as a bubbling cauldron of

simmering resentment, or a container for some other building emotional pressure (fear, anger,

jealousy, injured pride and the like) which has a way of escaping periodically in the form of

statements and behaviors";

(H)      the Team is asked to rate whether the student has "bizarre thoughts," which "are

likely indicative of a serious problem, such as schizophrenia, manic depression, acute drug

intoxication, or some other imminent medical problem";

(I)      the Team is also asked to rate the student for "deviance in spiritual issues such as

anti-God or pro-occult belief system" and "anti-religion or violent religious extremism";

(J)      The Team rates "Family Risk Factors" which include choices of "separation,

divorce, marital affairs, difficult child custody," "neglectful or harmful parenting," "violent,

ineffective, anti-social, toxic role models" ;

(K)      instruction to the Team includes that "[r]apid escalation is also indicated for the

person who regularly violates the body space of others, is provocative in their interactions with

others, and exhibits aggressive body language such as clenched fists, jaw tightening, or glaring

("evil eye")";

(L)      Instruction that "prevalence of violence is more than five times higher among

13

people with a diagnosable mental disorder. . . .";

(M)      instruction that "the presence of a diagnosable mental disorder or behaviors may indicate increased risk for violence under the right set of conditions";

(N)      a checklist of "traits" for "Personality Disorders" including "may appear superficially glib and charming";

(O)      annotation that "some perpetrators of extreme school violence have suffered from learning disabilities. . . A similar dynamic may evolve from symptoms of Attention Deficit/Hyperactivity Disorder (ADHD) and the resulting consequences";

(P)      guidance that "behavior problems in K through third grade are an important risk factor. . . .[I]t can . . . represent the early onset of a serious mental disorder";

(Q)      guidance also instructs that "research has demonstrated that those with a lower socio-economic background have increased risk for violence";

(R)      the Threat Assessment Plan Summary page is unnumbered "because it is the only page the parents/guardians typically receive a copy of".

62.      The Threat Assessment Plan paperwork filled out by the APS Threat Assessment Team,  meeting without the parents,  is not given to parents but is instead kept in a sealed envelope in a student's cumulative file and also sent to the APS Director of Threat Assessment who keeps it indefinitely.   If the student transfers to another school in or out of the state of New Mexico, APS policy is to furnish the Threat Assessment Plan information against the student to the "receiving school" either orally, electronically,  or in hard copy, without any notice to Parents required.

63.      The **APS Resource Manual: "Threat Assessment Plan"** discussed above is

more than 40 pages, plus sample forms.  Nowhere does it contain any reliable information about children with disabilities,  including but not limited to Autism.  The only reference to terminology  which is consistent with the field of special education is when the term "Learning Disabilities" is used, although that section links "learning disabilities" to "some perpetrators of extreme school violence."

64.  According to testimony from the APS Threat Assessments Director, the TAT documentation forms used by APS during the 2018-19 school year and currently have not changed much since they were originally adopted in @ 1999.

## VII.  CLAIMS

**IDEA Decision and need for revision to remedy ordered**

65.    The Hearing Officer decision in DPH 1920-04 held that exclusion of N.B.'s Parents from the formal Threat Assessment Team meeting on March 29, 2019 deprived N.B. of FAPE because Parents "were not given the opportunity to act in a meeting regarding an evaluation and a provision of FAPE to their child."  The Threat Assessment Team meeting had included discussion of N.B.'s "special education behavior management" but had not included parents in decision making.

66.    The Hearing Officer's decision in DPH 1920-04 also held that the failure to provide the TAT paperwork to Parents significantly impeded their opportunity to participate "in the decision-making process for a provision of a free appropriate public education" which denied FAPE.

67.    Both findings were grounded in the fact that Student's "behaviors" ---- linked to disability of autism as well as APS's failure to provide necessary special education (including

15

more than a year's delay in conducting a Functional Behavior Assessment (FBA) and creating a

Behavior Intervention Plan (BIP) ---- were a significant area of concern for both APS and

Parents.

68.    Remedy ordered in DPH 1920-04 for these deprivations of FAPE comes at

page 112 of the decision under a heading, "TAT Meetings and Records" and states:

> Once again, to fashion a remedy prospectively. . . ., due to
> the Student's unique circumstances and the composition of the
> TAT Team and required discussion about the special needs of
> the Student, the Student's Parents will be invited to participate in all
> future TAT meetings, as a special education meeting, should the TAT
> Team continue to be composed as in the past and continue to consider
> the Student's special education needs.  The parties did not address
> possible redaction of names or other materials, and it will not now be
> addressed.

69.    Remedy for violation of IDEA and deprivation of FAPE lies in equity

and is reviewed for abuse of discretion.

70.    The remedy set forth at page 112 of the decision is an abuse of discretion because

(A)   it contains ambiguity and conditions which do not clearly provide Parents with legal

assurance that APS will invite them to all future Threat Assessment Team meetings consistent

with analysis and legal reasoning expressed in the decision ; and (B) it fails to specify that

Parents are entitled to all Threat Assessment Team paperwork in the future.

71.    The remedy set forth at page 112 also fails to specify that the right to attend Threat

Assessment Team meetings must extend to all parents of students with disabilities in APS,

entitled under the IDEA to be involved when decisions are made regarding the student's needs

arising out of disability including placement and special education services.

72.    The remedy set forth at page 112 also fails to specify that the right to receive

16

copies of all Threat Assessment Team paperwork concerning the student with disability should

be  provided to each parent of a student with a disability, entitled under IDEA to be able to

inspect all educational records concerning the Parent's student.

**Disability discrimination claims**

73.    The APS Threat Assessment Team  policies and documentation discriminated

against N.B. on the basis of disability.  N.B. was labeled a "medium threat" by APS staff

working from negative assumptions and prejudice against persons with disability.  Determination

that N.B. was a "threat" was without exercise of professional judgment as to knowledge

possessed by APS about Student's needs for special education, the impact of student's age and

his disability of (and resulting skills deficits from) Autism.

74.    The TAT process and paperwork against N.B. from March 2019 has resulted in

permanent and inaccurate labeling of N.B. which negatively impacts his right to receipt of public

education free from discrimination based on disability.  He was treated differently than

nondisabled students based on negative stereotypes about persons with disability and intentional

refusal to exercise necessary professional judgment.

75.    The APS Threat Assessment Team policies,  including the "Resource Manual,"

all protocols or forms used by the TAT,  and the way meetings are conducted discriminate on the

basis of disability  against any student with a disability  who is the subject of a Threat

Assessment.

76.    The APS Threat Assessment Team policies and written documents/forms also

have the effect of denying the benefits of public education to students with disability who are

determined and labeled to be threats, without any notice to their parents,  by the very staff who

17

are responsible for these students' education.

77.    The APS Threat Assessment Team policies and written documents/forms do not reflect exercise of professional judgment in either their creation or application.

78.    APS's use of different procedures (private behavioral health assessment or internal TAT team meeting) to "assess" a student's threat depending on whether the student receives special education or not is *per se* discriminatory as the procedures treat students with disability differently, and less favorably, on the *basis of disability* for no justifiable reason.

79.    Negative stereotypes and preconceived notions about disability suffuse APS's conduct of Threat Assessment Teams, through such examples as equating "learning disability" with a propensity to school violence.

80.    APS's conduct of Threat Assessment Teams, its Resource Manual, and its forms and checklists encourage negative assumptions based on ignorance about disability and the potential impact of disability on skills, including skills of effective social communication and ability to conform behavior to expectations.

81.    The APS Director of Threat Assessments believes that: "A lot of special education kids, they have a disability, and they say things that, you know, are scary to people"; "They just don't know how to communicate in an appropriate way." *See* quotations found at https://www.searchlightnm.org/whos-the-threat (last viewed on 5-1-2020).

82.    This bias against children with disabilities is reflected in the APS forms, the process of the APS Threat Assessment Team, and the way meetings are conducted in secrecy. Yet TAT decisions and documentation follow and label a student, even when he leaves the school district — with the affixed label that he has been determined a "threat."

83.    The statistical outcome that students with disabilities are three times more likely to be the subject of "threat assessment" than nondisabled students is predictable,  given APS practices which reflect a total absence of professional judgment and instead rely on long rejected and unsupported beliefs about how "scary" people with disabilities are.

84.    Disproportionate use of Threat Assessment Team processes against students with disabilities is built into the structure and mechanisms created and practiced by APS, as was done against N.B. in 2019 and has been done against hundreds of other APS students with disabilities during the last three school years.

**IDEA civil action for Fees and costs**

85.    Parents were the prevailing parties in DPH 1920-04.

86.    Award of reasonable attorney fees for the IDEA due process hearing is within this Court's discretion pursuant to IDEA, 20 U.S.C. § 1415(i)(3)(B).

87.    Legal work done to represent Parents in DPH 1920-04  was necessary and reasonable and is supported by contemporaneous time and billing records showing 200+  hours of time.

88.    Parents' attorney's hourly rate of $300 per hour is reasonable based on rates prevailing in New Mexico for the kind and quality of services furnished.

89.    Award of fees for work done at the administrative level on DPH 1920-04,  as well as work done on this action to revise remedy and seek fees,  is reasonable as an important procedural right of parents conferred by the IDEA.

90.     Motion practice in accordance with a scheduling order is the traditional vehicle for determination of entitlement to attorney fees under the IDEA after the filing of this civil

action to preserve the IDEA fees claim, as well as to revise remedy ordered.

**Potential Class Action for equitable relief against APS**

91.    This action seeks equitable remedy for N.B. and all similarly situated

Albuquerque Public Schools students subject to APS's Threat Assessment Team processes since

the 2016-17 school year.

92.    After discovery to identify the proper contours of a proposed class of APS

students with disabilities, Plaintiffs, who are appropriate class representatives, will move for

class certification for a Rule 23 (b) class to seek equitable relief for the class to include: 1)

mandatory notice to Parents when their child is the subject of a threat assessment; 2) mandatory

right to attend all Threat Assessment Team meetings for all parents whose child is the subject; 3)

mandatory right to receipt of all paperwork considered and created by the Threat Assessment

Team for all parents whose child is considered; and 4) to additionally require that APS scrap its

current Threat Assessment Team model and adopt a model which reflects professional

understanding of disability, and federal and state law governing special education and prohibiting

discrimination on the basis of disability in delivery of public education.


**PRAYER FOR RELIEF**

Plaintiffs request the following relief:

1.    Plaintiffs request that the Court modify remedy described at p. 112 of the Due

Process decision to clearly require 1) N.B.'s parents are invited to any Threat Assessment Team

meeting for N.B. conducted by APS at any point in N.B.'s education; 2) N.B.'s parents will be

provided all paperwork created by any Threat Assessment Team considering N.B. at any point in

N.B.'s education;

2.     Plaintiffs request that, upon proper Motion, the Court certify an appropriately described class and grant class certification ;

3.     Plaintiffs request that the Court grant declaratory relief recognizing that APS's Threat Assessment Team Plan process discriminates on the basis of disability. Plaintiffs request that the Court grant injunctive relief: 1) to ensure all guarantees for N.B. are expanded to all students with disabilities (parents to attend meetings and be provided all documents), and 2) to ban APS from use of its Threat Assessment Team practices and require that APS construct new policy and procedures for threat assessments of students with disabilities which are consistent with IDEA and federal law prohibiting discrimination on the basis of disability in public education;

4.     If class certification is granted, Plaintiffs ask that order be entered directing APS to provide all past Threat Assessment paperwork to all parents of students in the class. Plaintiffs further ask that all past Threat Assessment paperwork be permanently removed from class members', including N.B.'s, permanent files and any files maintained by APS;

5.     Award of attorney fees for the underlying IDEA administrative due process hearing consistent with Parents' request;

6.     Award of fees and costs pursuant to Section 504 and the Americans with Disabilities Act for reasonable fees and costs of this lawsuit as to disability discrimination;

7.     Award such other relief as the Court deems proper.

Respectfully submitted,

STEVEN GRANBERG, ATTY. AT LAW

*/s/ Gail Stewart*

_____

Gail Stewart
3800 Osuna NE, Suite 1
Albuquerque, NM 87109
(505) 244-3779, x. 3
gstewart@66law.com
*Attorney for Plaintiffs*